Okay, the next case is number 15-14-18, Rudolf Technologies, Incorporated, against Camden Tech, Ltd. Mr. McDonald, when you're ready. Thank you, Your Honor. May it please the Court. We are here as the patent owner challenging a conclusion of the Board of Obviousness of Certain Claims of the 528 patent based on its finding that one sentence in the prior art element reference is ambiguous. The 528 claims briefly compare a substrate such as a dye on a semiconductor substrate to a model trained with images of multiple known good quality substrates. That works well to find acceptable variations from what might be perfect and still be able to identify a dye as good and usable. So it's a reality based model because it's using actual images and it's also a diverse model because it's using multiple real images to see this variation. Element teaches three other approaches to this inspection process. The best summary of that is a sentence in column 2 at lines 50-54 of Element that you'll find at Joint Appendix 371. That sentence talks about a like-to-like or dye-to-dye comparison, which is not a model and not diverse. It also talks about a dye, a comparison of a dye to a pattern on the same dye. So it's not even a different dye here. It's called a repetitive pattern. Again, that one's not diverse and it's not a model. Then the third one is called a dye-to-database comparison, which is a model, but it's not diverse and it's not based on real images. As the Board noted, that's a synthetic model. It's mathematically based, for example, maybe on the specification or the equivalent of a blueprint of what it's supposed to look like, but that's perhaps too ideal for the reality of taking the photograph so it doesn't have that diversity and it's not reality-based. That description is at the Board's decision at Joint Appendix 13 where they call that synthetic. Now the Board was correct in finding that Element does not necessarily describe any other embodiment than those three. Of course, that's where they rejected the anticipation findings by the examiner and we don't appeal that, of course. But their error was to take that same sentence in Element that was used for that erroneous anticipation defense and find that it was ambiguous because it might describe yet another approach to this comparison process. For that reason, that one sentence found at Column 8 of Element in the Board's opinion finally rendered the claims here obvious. That conclusion of obviousness was infected by two legal errors. One, the Board failed to read Element as a whole. It took that one sentence out of context. And we see cases like COTSAB or Smith-Klein that we cited that say you can't read a sentence or two in the abstract. You have to look at the entirety of the reference when evaluating obviousness. And in fact, the Board agreed that that one sentence could mean that die-to-die comparison that's much different from what we've claimed. It's not diverse and it's not a model. And it should mean only that. It was not ambiguous. That's the first error. The second error is that ambiguous alternative meaning that the Board found referred to what it called a collective or plural-to-one comparison. And even if we assume erroneously that that alternative meaning would apply, it is a leap to go from there to find our claims here obvious because we didn't claim a collective comparison per se. We were claiming training or modeling these substrates using multiple good quality substrates or wafers. I'm paraphrasing because we have a number of independent claims here, but that's the core concept that you see in all of those. And to go from this discomparison to collective comparison all the way to there, the Board makes that leap with no evidence in the record, nothing it has. It really just relies solely on hindsight, knowing what our claims look like, to say, oh, could you construe it that way? Can I interrupt you just for a minute? Sure. So you agree, though, that it is a question of substantial evidence. Is there substantial evidence to support that reliance on that one sentence to conclude that there's these possibilities, that there's two different possibilities of doing it? But the question is whether there's substantial evidence, whether that one sentence provides substantial evidence. That's one way to look at it, Sean. I appreciate that. I mean, that's the standard of review. I just want to make sure that, because from your brief I wasn't sure because it sounded as if you were suggesting it's a legal question. Yeah. And I don't agree with that, so I just want to make sure I'm asking you about it so you can explain to me what you think it is. Well, I think the obviousness finding is a legal conclusion. But you're right, there's this issue of what's the scope of the prior art. That's a fact sort of finding here. But when the Board's approach to determining the scope of the art is infected by a legal error, then I think we do cross the line to evaluating it as a legal issue. There are the cases that say as a matter of law you do not evaluate the prior art, a one sentence in isolation. You have to look at it as a whole. So there are legal problems that infected their analysis. Moreover, even if we just accept the element is an undisputed fact here, there is no expert testimony or anything else. There is a record here within the four corners of that prior art. The Board didn't rely on anything else. So you have undisputed facts and my second error there I think is taking a leap then to this obviousness conclusion. So I would say it is as a matter of law based on undisputed facts. Also, if you actually look at what the Board found factually about Allen, that ambiguous alternative meaning, my second point was even if we accept that fact finding as true, merely finding a collective comparison is insufficient legally to reach the conclusion that there's obviousness for our claims. They aren't saying collective comparison, they're saying something more specific than that about training and modeling with multiple good quality images. Collective comparison doesn't get you all the way to there as a matter of law. Even if we accept that fact finding by the Board in isolation and out of context is true. So I think there are some legal problems here as well. That's my point. So if we go back to that first legal error, the out of context issue, there is absolutely no description and element of a collective comparison or anything that would be modeling based on multiple real images. That sentence, the key sentence that's found at Joint Appendix 374, it's Column 8 of Allen. And it talks about a comparison of an inspected pattern with the light pattern of at least one other die serving as the reference pattern. Now that prior, if we go back to that sentence on JA 371 that describes that, it's a pattern on another like article. That's the die to die comparison. So it's like to like. That's what this means. And pattern to pattern. Isn't the phrase you just read imply that there's multiple dies? The at least one phrase, Your Honor, is I think what you're talking about. At least one. Okay. So I would say no to that in context. Even in this sentence. Because if you look at the entirety of the sentence in Column 8, the first part of it begins at line 37. As also indicated above, during the Phase 1 examination and also the Phase 2 examination, the pattern, the inspected pattern is compared with the light pattern of at least one other die. I paraphrased the second part. But the first part talks about we're doing, we're talking about examination number 1 and 2. It's a two-phase process in Allen. They do kind of a rough cut to find the potential problem areas. Then they use a second phase to zero in on those problem areas. Well it's talking about two examinations here. So within the four corners of that sentence, when it says at least one other die, it totally works with what we say it means, that this could be two separate steps. Not one step using multiple collective comparisons, but two separate examinations. The sentence itself says, Phase 1 examination and Phase 2 examination. So I would say even in the four corners of the sentence, you can reconcile that at least one language with multiple one-to-one comparisons. And that's of course, as we were saying, consistent with the whole spec, which never talks about this collective comparison sort of approach to it. And there's nothing that CamTech has cited here either that would give you any support anywhere in the spec for how would you do this collective comparison? What is the modeling method? Why would you do it that way instead of some other way? There's just nothing in there that supports that out-of-context approach to the element. So that's the first problem. Finding that ambiguity is erroneous because it was out of context. And in fact, that sentence is not ambiguous. It's only referring to one-to-one die-to-die comparisons. So the second area, if we look at the joint appendix and go to what the board found, this goes to your point, Your Honor, what are the fact findings here? What the board found here is that that sentence, the comparison is either done individually on a die-by-die basis, i.e. multiple one-to-one comparisons, that's what we say is the meaning, or collectively, i.e. what that alternative meaning is. But like I just said, I think that's erroneous. But if we accept that as factually we have to live with that, that still doesn't get you all the way to finding our claims here obvious. None of our claims talk about a collective comparison. They talk about, like in Claim 1, visually inputting a plurality of known good quality images during training, or Claim 9, optical viewing of multiple good quality substrates, things like that. So you have a leap here. And the board cites no evidence or analysis to fill that gap. It used a kind of an Ipsy-Dixit, hindsight-infected conclusion that CODSAB teaches is insufficient. The court needs to show a specific understanding or principle within the knowledge of the person of skill that would make that leap appropriate. And in fact, what you have here is the opposite, because in Alamut it actually teaches at Joint Appendix 371 in its background the opposite of doing a comparison that's the type we talk about that's based on multiple real images where you go pixel by pixel and create these models. There at Column 1, Slides 28 to 34, it talks about there are some systems out there for inspecting wafers generally based on analyzing high-resolution, two-dimensional images of a patterned wafer using a charge-coupled device, CCD, that's the sort of thing disclosed in our patent, on a pixel-by-pixel basis, which is what we talk about. However, the we're not doing it that way. That's actually the opposite here in the four corners of Alamut. So there's actually teaching away from going to our system. Now in response to that, CamTech proffers a number of rationales that the board did not rely on to try to help fill that gap. I think really the headline there is that that shows that they can't really support the board's decision within its four corners on its face. One thing they do there is they go to this other prior art that was not cited by the board or the examiner, or at least relied upon, Chow and Kobayashi. Now Kobayashi was cited by them in the request for reexamination for other claims. And those claims did not make it into the reexamination. They cited Kobayashi not for this modeling feature. They cited it for teaching solder bumps. And that's at page, Joint Appendix 897, I believe. Could I direct you, I just want to ask you some questions before you run out of time, about the scope of Claims 1 and 9. In its opinion, the board noted that there was a difference in the scope there, and specifically pointed out that with respect to Claim 1, it was broader. And when it talked about how you were developing the model, it didn't require that the model be developed from more than one good quality substrate. Well, Your Honor, on Claim 1, I think it was a little unclear what the board was saying, because I see on page 9 of their decision, Joint Appendix 10, they say with respect to Claim 1, even assuming without deciding that the recited model that the microprocessor develops is trained using plural known good quality substrates, they're reaching their findings. So did they decide that it doesn't need two or not? I think that sentence there actually suggests that they were saying, well, we're not deciding one way or the other. We're assuming even if there's multiple ones, that these claims are obvious. Right, but can you explain to me, if I look at the claims, and I think that the interpretation here, I look at the claims and I see a difference between Claims 1 and 9, and so I wanted to give you an opportunity to explain why Claim 1 isn't broader than Claim 9. Okay. So, well, Claim 1, I would say you have, the key there is the model aspect of it, and the training. Are those two things tied together? I think that's the point, right? And when you see that section of the 528 pad, it totally intertwines training with the modeling. You can't have the one without the other. That's in Figure 3. It shows the step-by-step. That's the training section, as you go back to Figure 2, where it talks about we train and we inspect and so on. It has a sub-flow chart in respect to what is training. And it includes developing a model of a die. These two things really are inextricably intertwined to each other. And even the board itself notes when it's talking about the means plus function clause, or claims, that if you have a section in the spec of column 13 where it says the model, I think the word is definitional, a model has at least two die, has to have at least two things to create that statistical model involving a mean and a standard deviation. So I think to the extent the board made a mistake there, like I said, I think it's kind of unclear where they were going. But if you're just asking me, what does that mean? I think it's clear from the district court construction, but also just reading the 528 patent, whether you have that or not. Training and modeling go together, and Claim 1 clearly requires those things to involve multiple dies or substrates. You have that up in the visual inspection device phrase, where you have a plurality of known good quality substrates having a user-defined level of quality during training. So that's Claim 1. What was your other question? That was it. Okay. Okay, let's save your rebuttal time and let's hear from the other side. That's fine, Your Honor. Thank you. Mr. Bielski. Thank you, Your Honor. And may it please the Court. There has been a, just so you are correct, the standard is a substantial evidence standard, and under the case law, that is something that reasonable minds might find acceptable, evidence that reasonable minds might find acceptable. And as the applied case of this Court stated, just because people may come, there may be opposite inconsistent positions, does not mean the evidence is not substantial evidence. And that is applied at 1294. And under the Supreme Court's decision in Consolo, it's something less than the weight of the evidence. That's at Consolo 620. Now, in the Houston case, what this Court says is, even when the Board is not very explicit about its reasoning, if there is a reasonable path to discerning what that reasoning is, you can affirm that decision. And this situation is very similar to what the Houston Court found and is explained at footnote 9 of its decision. Now, Mr. McDonald has stated that there is no evidence and the Board relied solely on one sentence. Well, it did focus on one sentence, but there was a significant amount of evidence in the record. And what the Board said at page 9 of its decision, which is at 2322 of the Joint Appendix, it said the weight of the evidence on the record supports what the examiner found. Now, there actually were two bases that the examiner used to make the rejection. One was very explicit and actually has gotten very little attention here, has gotten no attention from Rudolph. The second basis was not as explicit and has gotten some attention here in the briefing, and that is those two pieces of prior art, the Chao reference and the Kobayashi reference. Let me just go to the first point, which is the basis that the examiner found very explicitly. And it relies on something which has been overlooked here, and that is what the claims actually say is using multiple substrates, if you interpret all the claims the same. The model is made using multiple substrates. What is a substrate? Well, the claims actually tell you. They say a substrate can be a wafer, it can be a dye, it can be part of a dye, it can be a plurality of dyes, or it can be parts of plurality of dyes. And actually, what happens here, even in the 528 patent, the way that the examination is done, it is done on a pixel-by-pixel analysis. So, when you look at the 528 patent and its column 16, line 41 to 45, what you see, the way the model is actually created, you take one pixel that you're inspecting, you've got your model is actually created by creating averages of the intensity of each pixel that is going to be compared to the pixel under inspection. Now, when you look at the Alumod patent, that's actually exactly what's done. And that was cited to the examiner, and the examiner actually cited that in his rejections and, in fact, cut and pasted portions of the Alumod patent that describe that. So, at the joint appendix at page 12, I believe it starts at 1225 to 1233, some of which is actually not in the joint appendix. I think we only included 1231 to 1233. But you can actually see at the examiner's rejection, which starts at page 1294, he says, CAMTEC's arguments have been considered, and I am rejecting the claims because what happens in Alumod is pixel information in the reference is compared to... I'm sorry, did you say that's at 1225? 1225 is CAMTEC's patent owner's response, or excuse me, is CAMTEC's response to the patent owner saying the claims are not obvious and don't teach the model. That starts at 1225, goes to 1233. The portion that I'm quoting right now is not actually in the joint appendix, but it's part of that. But you can look at what the examiner said to actually glean what CAMTEC argued to the examiner. So, if you see the joint appendix at 1294, what the examiner actually says is that when you look at the pixel information in Alumod, there's two pieces of information. There's the intensity. So I take the inspected, I take the reference, I look at the intensities. Do I stop there? No. Because to make a determination as to whether that intensity information is really valuable, I have to figure out what that pixel is actually representing. Is it representing the center of the guy? Is it representing an edge of the guy? And to make that determination, the pixel type information, what Alumod teaches is you look at all these pixels around it. It's actually a 3x3 neighborhood. And you look at that 3x3 neighborhood, you take averages, you use histograms, and based on that you make a determination of what the pixel type is. And what the examiner said is, hey, that's actually a collective comparison. Because what the claims say is a substrate can be a portion of a dot. In other words, a pixel, a picture element. So the examiner cited that to the patent owner, and the patent owner comes back and says, ah, that can't be a model because that information is not stored. And that is at the Joint Appendix 1313. The examiner comes back and the examiner says, no way, you're wrong. That information is stored. It's stored in memory 75. And that's at 1365 of the Joint Appendix. And the examiner, in his actual rejection on the model, so at 1375, he makes that argument, and then he cuts and pastes. He does a cut and paste and puts the actual text from the patent in there, an image of the Alumod patent in there, and cites to that. And then in the actual rejection, he cites the column 12, lines 28 to 30 of Alumod, which is column 12, 28 to 30 of Alumod is actually in the Joint Appendix at 376. So there was this very specific reference to that, and Cam Tech, in its briefing before the PTAB, actually referred to that. It got referred to at the hearing, and it's actually referred to again before this court, the blue brief at page 6. So there actually is information on the collective comparison, because what you're actually comparing is pixels. It's one pixel to another pixel, and the reference pixel on Alumod is not just based on that one pixel that corresponds. That one pixel, you figure out the type, and it's based on this whole neighborhood. If you were to argue that, in fact, it can't just be a pixel, contrary to what the claims say, that it has to be a die, Alumod also addresses that, because it says, when you look at the image that you take, actually it's not necessarily just one die. It can overlap multiple dies, and you can see that in figures 9 to 11 of the Alumod patent. You actually can see the figure. There's a circle, and you can see that circle overlapping multiple dies. In fact, when it does the 3x3 analysis, some of those pixels may be on one die, some of the pixels may be on another die. It's fully consistent. When the board said that the weight of the evidence supports what the examiner found, the board knew that the examiner was relying on this pixel data that was created from multiple pixels, not just one. Just to show you that that actually is exactly like what the 528 patent does, column 16, 41 to 45 of the 528 patent at issue says, and I think this is the direct quote, but I might have a few words wrong, each pixel on unknown quality waivers is viewed whereby the model is used to determine if the pixel and or group of pixels are deemed good quality or questionable. You'll see there's an example in that 528 patent where it says, on one pixel the intensity value is 98, on one of them it's 100, on the other one it's 105. The average of those three is 102 plus or minus something. That's actually exactly what the Alumod patent does. In fact, it mentions averages of the pixel data at column 14, line 10, and that's in the joint appendix at 377. Let me get to the second point of evidence which supports the conclusion that the board and the examiner came to, which is when you read that sentence about at least one die, is there any support in the world for a person of ordinary skill interpreting that to mean more than one die is used in creating the reference? The answer is absolutely. As this court knows, when making an obviousness determination, what you must do is look at the scope and content of the prior art. When you look at the scope and the content of the prior art, it was very well known that you want to use multiple inputs to create your model. Where was that known from? CAMTEC told the examiner that it was known from the Chao and Kobayashi references. Where is that in the record? That is in the record at joint appendix 1231 and 1233. The reason that CAMTEC made that statement was to rebut an argument that the patent owner made, saying, hey, creating this model by using multiple inputs is not known. CAMTEC responded, as it is allowed to do under 37 CFR 1.948A2, and as the case which Rudolph actually cited, the Belkin case at 1383, says it can do. CAMTEC responded to an argument that the patent owner made, saying, hey, it's not obvious to make a model based on multiple inputs. I believe there are two paragraphs. One paragraph refers to the Chao patent, and one paragraph refers to the Kobayashi patent. So there are two paragraphs. The same argument was actually made in the PTAB brief, which is joint appendix 1878, and it was also discussed briefly at the hearing. Rudolph has said, you can't consider that evidence, and they actually cited the Belkin case and they say, hey, this is a totally new ground. We're not talking about a combination. What we're talking about is what this court and what the PTAB was required to do, which was understand what the scoping content of the prior art is, so that when they read that sentence, at least one die, they are informed of, well, how would a person of ordinary skill in the art understand that? Given the fact that it was well known in the prior art that you want to use multiple inputs to create your model, a person of ordinary skill in the art reading that at least one die would say, of course, yeah, use multiple inputs, multiple die, to make the one, two model comparison where your model is based on multiple things. If you look at the Chau patent, it's Chau column 4, 23 to 27. I don't have a joint appendix site because Rudolph objected to that being included in the joint appendix, but the clerk of this court said we filed a motion for the court to take judicial notice of it. It was granted, but if you look at the Chau patent at column 4, line 23 to 27, it says the reason that you want to take multiple inputs to make your model is to make sure that you're not going to come up with all these false defects. It really helps in accounting for that. That language, the reason why it's done, the way that that problem is solved, is identical to what the 528 patent does. I would ask the court to, I don't have enough time to actually go through the language verbatim, but column 4, 23 to 27 of Chau compared to column 13, lines 10 to 15 of the 528 patent, you're going to find the exact same reasons for making the model based on multiple things. Now, given the state of the prior art, the arguments that were made to the PTAB which was in the record, it was completely reasonable for the patent office to come to the conclusion that based on that one sentence, the model was created from collective information. Let me just get briefly to one thing that was not addressed, and that's the standing or the ripeness issue of claims 30 to 34 and 36. We did cite to the ACME case the notice of appeal that the PTAB issued, cited to the provisions in the CFR and to the statute that says this is a new rejection. When you have a new rejection, you have two options. A new rejection is not something final that you can appeal. You have two options. One option, request re-hearing. Option number two, request further prosecution. Neither one of those was done. Those claims are not properly before this court. And last, since I have 27 seconds left, Your Honor, you asked about the difference in scope between Claims 1, Claims 9, and I would also add Claims 14. You are correct. Claim 1 and Claim 14 do not require multiple inputs to create the model. Claim 9 actually does. And I will end it there. Thank you. Do I have 43 seconds, Your Honor? Okay, four minutes. The points they make here, I think, are not justification for affirming this decision, because there's just no analysis in the board's decision that's consistent with what he was just talking about. There's no reliance on Chao or Kobayashi in there. Now, Kobayashi is a printed circuit board inspection system. That's like your old AM radios would have solder bumps in them from a board that has little transistors that you could actually see back in the 60s or 70s. It's not looking at semiconductor substrates. Chemtech tried to use Chao to invalidate the sister patent. It's also in litigation we mentioned in here that's in that decision reported at 655F3rd. And it didn't find these claims that also involved modeling with multiple substrates or wafer sorts of things. The patent was found valid over Chao. There's differences. Chao does not do a pixel-to-pixel comparison. It looks for dramatic changes on a substrate, an image of it, where there's a dramatic change, but that would indicate some sort of an impurity on it. That's what our expert explained when you go into the context. I can't imagine how this court's going to sort out what Chao means or what Kobayashi means here. The point is that the board did not rely on that. Even though it had that as part of its record, it deemed it insufficient to support its findings. Irregardless of the prosecution history, just looking at Alamut and back to that term, at least one other dye, why isn't that sufficient to inform one skill in the art that the use of multiple dyes is an option? It informs them that the use of multiple dyes in multiple comparisons is an option, because the first part of the sentence says we have this in both the Phase I and the Phase II examinations. You would admit that the use of the word at least one other dye implies, or one skill in the art would look at that and say, well, multiple dyes, I can rely or use multiple dyes. It would include one dye, or it could include more than one. That's multiple one-to-one, a single one-to-one. Why wouldn't that be substantial evidence? It's inconsistent with the rest of the specification and that sentence, because there's a lot more to comparing with multiple dyes. You're not going to talk about multiple one-to-one. If I'm going to compare one to a lot, how do you do that? The board did go through the prosecution history and looked at all the other references and concluded that, at least on the basis of this one sentence, that multiple dyes was an option to one skill in the art. It found, as it put it, a collective comparison. That's the words that the board found. My second point there is I think that's inconsistent with the spec, which nowhere talks about such a thing. That still doesn't get you all the way to modeling and training with images of multiple known good quality wafers. That's a lot that the board had packed into just that phrase, collective comparison, without any citation to the record or any place else that would support that legal conclusion of obviousness. It is very parallel, I think, to that COTSAB case in that sense. Can I ask you about another argument that CamTech's counsel made? He pointed out that the claim, when it talks about a substrate, defines that as being just even part of a wafer. Therefore, I guess the idea is that you don't even have to compare multiple wafers. You can compare multiple parts of a wafer. How do you respond to that? That first case we had at 655 F 3rd, I talked about different parts of things. That was where it was remanded, in part, because the court said, well, when you have that, it has to be discrete parts. If you have just parts of the same dye that's physically connected to each other, that's not discretely separated. That was the whole issue in the first case where we had to redo it. That's working its way up again here after we got another finding of infringement, even with the new claim construction there. That's where it's being taken out of context here and just not consistent. The board didn't rely on that at all. What the board found at its decision at Joint Appendix 13 and 14 is that Element does not necessarily describe that modeling based on one-to-one, or modeling with two or more images, a comparison of one to a model based on one. It said it did not necessarily find that. What counsel is trying to tell you here is that the board really did find that Element has that when they were talking about the pixels and things. But the board's decision says they didn't find that Element necessarily describes that. The pixels there are very different. If you look, for example, at Figure 7 of Element, you'll see there's an array of light collectors, about eight of them in that embodiment, that are looking at reflected light coming off. What the patent talks about with these pixels, for example, at Column 9 of Element, at 45 to 50, at page 375 of the appendix, is that that's from sampling these reflected patterns. Element, as we pointed out in the reply brief, specifically says we're trying to minimize actually collecting data of the image. We just want to see the reflection. We don't want to see the actual image, that pattern on the die itself. That would be actually a distraction from looking for some impurities on the surface. It's a very different thing. Again, this is an issue that the board recognized that this did not support. That's the die-to-die comparison. The board said that's not enough to render these claims obvious. There has to be something else. Could you comment on rejected claims 32, 34, and 36? That, I think, had a unique circumstance here, because the board rejected that subset of the claims that was anticipated, and the board reversed that. Then they substituted in this 103 ground, which, in a sense, is then new. In another sense, it's the exact same ground they relied on to reject all the other claims, 1 and 9 and 14 and so on, for obviousness. They, in fact, say, in their opinion, as they're analyzing those, as we discussed above, Element suggests this collective comparison, and therefore renders this model based on multiple images obvious, as we discussed above. It's the same one we talked about for 1, 9, and 14. It's in this unique circumstance here. When you look at the context of what was the option here, what were we going to say to the board or to the examiner? They heard our argument. We think that sentence in Element is insufficient. They dealt with that, and they said that we're wrong about that. But there's no amendments to the claims. There was no new evidence. Isn't the decision quite clear about what you're supposed to do? Our decision includes a new ground of rejection, and then they tell you specifically what you must exercise, one of two options. Certainly, looking back at that, Your Honor, I understand you took that one sentence. When I say it's a unique circumstance, reading the decision as a whole, when there were the exact same grounds relied upon, the reality is we looked at that opinion and didn't appreciate that that's what we needed. It says a new ground of rejection. It seems to me that leaves room at the basis. The rationale for the rejection could have been the same, but now it's a new ground. Right, but when you look at what's the point of doing these other steps before taking an appeal? It's to present new evidence or to modify the claims. There was nothing else that we were going to do. The board understood our argument. They rejected it, but to repeat the same thing again didn't make sense to us. That's what happened. Thank you.